UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

JAMES FRANCISCHELLI,

                      Petitioner,

       - against -

RICHARD POTTER, Superintendent, Great
Meadow Correctional Facility,

                    Respondent.

--------------------------------------------------------------X

**MEMORANDUM AND ORDER**

1:03-cv-6091-ENV

VITALIANO, D.J.

    James Francischelli has petitioned this Court for a writ of habeas corpus, pursuant to 28

U.S.C. § 2254, contending that: (i) the admission of evidence at trial of an out-of-court "showup

identification" deprived him of due process; (ii) the evidence at trial was legally insufficient to

support his convictions; (iii) his adjudication as a persistent violent felony offender by the trial

court, and not a jury, was unlawful under <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000); (iv) his

sentence is unduly harsh; and (v) admission of testimonial evidence at his suppression hearing

violated his Sixth Amendment right to confrontation under <u>Crawford v. Washington</u>, 541 U.S. 36

(2004).  For the reasons set forth below, the writ is denied and the petition is dismissed.

**BACKGROUND**

**The Offense**

    On February 2, 2000, at about 8:30 p.m., Sudip Chowdhury ("Chowdhury"), a cabdriver,

picked up a man whom he described at trial as white, 22 to 25 years old, approximately five-foot-



nine-inches tall, slim, with light brown hair and no facial hair. The man, wearing a black coat, approached the taxicab from its rear. Chowdhury rolled down his right front passenger-side window, asking where the man wanted to go. At this point, Chowdhury could directly observe the man's appearance because a street light lit the area. The man responded that his destination was Queens Plaza and entered the cab through its right rear door. After two minutes, the passenger changed his destination to the YMCA. Four or five minutes later, the passenger pointed a fake black gun at the back of Chowdhury's head and demanded money. Chowdhury turned around and observed that the passenger's nose and mouth were covered by a black scarf, but "did not notice" the passenger's appearance thereafter. Having no idea that the gun was fake, Chowdhury handed over his money and complied with the passenger's order to pull over and get out of the cab. The passenger then got into the driver's seat and drove off. Chowdhury's black bag containing books, maps, and receipts was still in the cab when the passenger drove off with it. The robbery had occurred on 32nd Place near Queens Boulevard in Queens, New York.

### The Investigation

Chowdhury called 911 and was taken to the nearby 108th precinct on 50th Avenue. At about 9:10 p.m., police officers patrolling the area were informed by a radio transmission that a cabdriver had been carjacked at 32nd Place and Queens Boulevard. The report further indicated that the perpetrator was a blond-haired white man carrying a gun and wearing a black jacket plus something covering his face.

At approximately 9:30 p.m., a police detective, Christopher Drew, who had heard the radio transmission, arrested Thomas Devenuto and Leslie Rodriguez at the corner of 49th Street

2

and Roosevelt Avenue in an unrelated incident – the two had been found riding in a stolen car and a package of heroin was found in Rodriguez's pocket. After arresting the two men, Detective Drew sat them in the back of his police car. Rodriguez then began crying and pleaded with Detective Drew that he could not go back to prison. The detective asked Rodriguez if he could do anything to "help" himself, and Rodriguez replied by telling the detective about a taxicab robbery that had just taken place. Rodriguez claimed that the perpetrator was "Jimmy," a friend of his girlfriend's sister. Rodriguez told Detective Drew that he and Jimmy had been "smoking drugs" together only 20 minutes earlier a few blocks away at the apartment of Rodriguez's girlfriend. Rodriguez described Jimmy as a tall, thin white man with blond hair. Jimmy, according to Rodriguez, had told him that the stolen cab was parked around the block from the apartment, which was located on 45th Street.

Detective Drew, accompanied by two other officers, drove straight to the apartment complex on 45th Street, where the two sisters, Pamela and Penelope Hall, resided. Petitioner answered the door to Detective Drew's knock. Francischelli was immediately grabbed, handcuffed, and taken out to the lobby area of the apartment. Detective Drew then entered the apartment and explained to Pamela and Penelope Hall that the police believed petitioner had committed a crime. One sister responded that Francischelli had returned to the apartment "a few minutes earlier," saying that he had robbed a cab using a starter's pistol. Detective Drew was taken by Pamela Hall to a bedroom, where she showed him two fake pistols and a bag containing papers which included a bank deposit slip with Chowdhury's name.

At some point during this sequence of events, the officers decided to bring Chowdhury,

3

who was at the nearby 108th precinct, to the apartment complex to see if he could identify petitioner as the perpetrator. From inside a patrol car, Chowdhury viewed petitioner standing in the foyer area of the apartment complex alongside two white male detectives who were not in uniform and did not have their badges displayed. Petitioner was not handcuffed and was wearing a gray jacket. When Chowdhury observed the three men, he immediately picked petitioner out as the man who had robbed him. The identification took place at approximately 10:08 p.m. Police recovered the stolen cab at a location not specified in the state court record.

### Proceedings

Francischelli was charged with two counts of second-degree robbery, N.Y. Penal Law § 160.10(2)(b) and (3), one count of fourth-degree criminal possession of a weapon, N.Y. Penal Law § 265.01(2), and one count of fifth-degree criminal possession of stolen property, N.Y. Penal Law § 165.40. Prior to trial, the court determined that evidence regarding Chowdhury's pretrial identification of petitioner was admissible, holding that:

> [i]n addressing the show-up conducted of the defendant, this Court finds it fair and non-suggestive, particularly against the backdrop of case precedent. The defendant was apprehended within fifteen to twenty blocks from the crime, within one hour of its commission and identified, not handcuffed, on the street surrounded by other white males.

People v. Francischelli, Ind. No. 679/00, slip op. at 6 (Sup. Ct. Queens County Dec. 18, 2000).

At trial, in response to questioning regarding the cab ride, Chowdhury testified that he had observed the passenger's face before the man had entered the cab, when he sat down in the vehicle, and when he asked to change destinations. Chowdhury did not specify, however, whether he had observed the passenger directly or through the rearview mirror while the

4

passenger was inside the vehicle. The only instance in which Chowdhury specifically mentioned turning around to look at the passenger was at the point after the passenger had drawn a gun and covered the lower part of his face with a scarf. During continued examination, Chowdhury identified the gun that was pointed at him. Then, when asked if the perpetrator was in the courtroom, Chowdhury pointed out petitioner, saying "that's him. I think that's him." Chowdhury was shown a picture of Thomas Devenuto, the man who had been arrested with tipster Leslie Rodriguez and whom defense counsel attempted to establish at trial as the true perpetrator. Chowdhury responded that he had never seen Devenuto.

Penelope Hall, petitioner's former girlfriend, testified at trial that she lived in and was present at the 45th Street apartment when petitioner was arrested there on February 2, 2000. She denied that anyone had used drugs in the apartment that night. She also claimed that she had heard Francischelli in her sister's room, prior to the robbery, looking for guns and saying that he was going to rob someone. Penelope attempted to stop petitioner, but her efforts were in vain. Francischelli left the apartment only to return a half-hour later carrying a black bag full of papers, bragging that he had just robbed a cabdriver. Police arrived shortly thereafter, and the Hall sisters cooperated.[1]

Detective Drew, of course, testified at trial. His testimony was consistent with that of Penelope Hall. On cross-examination, defense counsel drew the detective's attention to a report

---

[1] In addition to the testimony she gave inculpating Francischelli, Penelope's cooperation included escorting Detective Drew to the room containing the fake pistol and stolen personal effects of the cabdriver. Penelope also testified that Leslie Rodriguez had not been in her apartment on the night of the armed robbery, as he had claimed, and that Thomas Devenuto had been in her apartment for a few minutes before leaving with Rodriguez in the stolen car that those two were ultimately arrested for riding in.

filled out by one of the police officers responding to the scene indicating that Chowdhury had

reported that the perpetrator was five-foot-nine-inches tall, 170 pounds, and with black, and not

blond, hair – a description more similar to that of Thomas Devenuto than the six-foot, 150-pound

petitioner. On redirect examination, Drew was shown arrest photos of petitioner and Devenuto.

He pointed out that Devenuto had a beard and moustache while petitioner did not. He further

testified that the pictures reflected how he remembered the individuals appearing on February 2,

2000.

Francischelli was convicted by a jury on all counts. He was adjudicated a persistent

violent felony offender, N.Y. Penal Law § 70.08, based on his 1985 convictions for second- and

third-degree burglary and his 1996 conviction for attempted third-degree criminal possession of a

loaded firearm. On May 15, 2001, the trial court imposed a prison sentence of 20 years to life for

each of the two robbery counts and one year for each of the remaining counts involving the

possession of a weapon and stolen property. All of the prison terms were to run concurrently.

### Appellate History

Petitioner appealed his judgment of conviction to the New York State Supreme Court,

Appellate Division, Second Department ("Second Department"), contending that: (i) he was

denied due process by the admission of identification testimony obtained through an unduly

suggestive procedure; (ii) his convictions were not supported by the weight of evidence; (iii) his

adjudication as a persistent violent felon by the trial court was unlawful under Apprendi v. New

Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (iv) his sentence was unduly

harsh. On March 10, 2003, the Second Department rejected petitioner's claims and affirmed the

judgment of conviction. People v. Francischelli, 303 A.D.2d 521, 756 N.Y.S.2d 447 (2d Dep't 2003). The court wrote that "[t]he showup identification was conducted in close temporal and geographic proximity to the crime and the defendant was not handcuffed or restrained by the plainclothes officers who were with him." Id. at 521. Petitioner's remaining claims were also explicitly rejected in the decision. Id. On May 23, 2003, Judge George Bundy Smith of the New York State Court of Appeals denied petitioner's application seeking leave to appeal the decision of the Second Department. People v. Francischelli, 100 N.Y.2d 538, 763 N.Y.S.2d 4, 793 N.E.2d 418 (2003).

Petitioner reports that, on January 6, 2005, he collaterally attacked his conviction, moving the New York State Supreme Court, Queens County, pursuant to N.Y. Crim. Proc. Law § 440.10 ("CPL 440"), to vacate his judgment of conviction because his Sixth Amendment right to be confronted with the witnesses against him was allegedly violated when the prosecution admitted testimonial evidence of individuals who petitioner never had the opportunity to cross-examine. On March 25, 2005, the court denied petitioner's motion. On June 8, 2005, the Second Department denied petitioner's application seeking leave to appeal from the trial court's denial of the CPL 440 motion.

Petitioner filed the instant petition on November 25, 2003. The petition raises the same four contentions that petitioner had raised on direct appeal to the Second Department. Petitioner filed an amended petition on September 25, 2006. The amended petition seeks to add the Crawford claim.

7

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, 1219 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication (1) was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court delineated an analytical framework to guide review of habeas claims, identifying the need to treat independently the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1). With respect to the "contrary to" clause, a writ may issue if the state court decision "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Id. at 405-06. With respect to the "unreasonable application" clause, a writ may issue if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry, however, is limited, and the habeas court may only issue a writ where the state court's application of Supreme Court precedent was "objectively unreasonable." Id. at 409. "Some increment of incorrectness beyond error is required" for a decision to be considered objectively unreasonable, though the increment need not be great. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

8

## DISCUSSION

I.  *Unduly Suggestive Lineup Claim*

Petitioner argues that he was denied due process when the trial court allowed the admission of evidence that he was positively identified by Chowdhury approximately one hour and 40 minutes after Chowdhury had been carjacked. Petitioner complains that the procedure was unnecessary: it was not conducted at the crime scene, nor was it part of an unbroken chain of events. Chowdhury had been taken from a police precinct back to an apartment complex for the apparent sole purpose of identifying Francischelli, who was already in the process of being arrested.

The Due Process Clause protects a criminal defendant from the admission of identification testimony that is both inherently unreliable and obtained through impermissibly suggestive procedures. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony"); Watkins v. Sowders, 449 U.S. 341, 347, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981); Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001); Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986). The standard for admissibility of such evidence has been clearly established by the Supreme Court's decisions in Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The Second Circuit has instructed that, in determining whether the improper introduction of identification evidence violates due process, a court must consider: (i) whether the pretrial identification procedures were unnecessarily suggestive; and if so (ii) whether the identification was nonetheless independently reliable.

9

Raheem, 257 F.3d at 133. "Independent reliability" in turn is determined by applying a five-part, totality-of-the-circumstances test, which takes into account: (i) the witness's opportunity to view the criminal at the time of the crime; (ii) the witness's degree of attention; (iii) the accuracy of the witness's prior description of the criminal; (iv) the level of certainty demonstrated by the witness; and (v) the time between the crime and identification. Biggers, 409 U.S. at 199-200; Brathwaite, 432 U.S. at 114. These five factors must be weighed against the "corruptive effect" of the suggestive confrontation. Brathwaite, 432 U.S. at 114. Even if the court concludes that the pretrial identification procedures were unduly suggestive and that the identification was unreliable, the error is still subject to a harmless error analysis. Wray v. Johnson, 202 F.3d 515, 525 (2d Cir. 2000); Raheem, 257 F.3d at 142.

### Suggestiveness

As the Supreme Court has noted, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." Stovall, 388 U.S. at 302. Such identifications, which typically take place shortly after a crime and sometimes at the crime scene itself, are known as "showup identifications." A showup does not "without more" violate due process. Biggers, 409 U.S. at 198. In addressing whether a showup identification is unnecessarily suggestive, courts inquire into the surrounding circumstances to determine whether the improvised identification procedure – inherently suggestive by nature – was, in fact, necessary. See United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992). An inquiry into the necessity of a showup should, in theory, entail a weighing of its disadvantages (e.g., suggestiveness and risk of tainting a witness's future identifications) against its advantages (e.g., allowing for identification while the mental picture is fresh in witness's mind, allowing a

10

wrongly detained suspect to be quickly released,[2] and allowing for police to quickly resume their search). See Brisco v. Phillips, 376 F. Supp. 2d 306, 313 (E.D.N.Y. 2005) (citing United States ex rel. Cummings v. Zelker, 455 F.2d 714, 716 (2d Cir. 1972)); Cannon v. Graham, No. 06-cv-1175, 2006 WL 3486803, at *5 (S.D.N.Y. Oct. 31, 2006); see also United States v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) (suggesting that a showup is most appropriate where the police officer has doubts as to whether he has apprehended the correct suspect).

The showup identification's advantages are most pronounced when it takes place in close temporal and geographic proximity to the crime. In these circumstances, "courts have consistently admitted showups." Brisco, 376 F. Supp. 2d at 313; Jamison v. Grier, 2002 WL 100642, at *20 (S.D.N.Y. Jan. 25, 2002) (citing cases). "[I]t is now settled law that prompt on-the-scene confrontation is 'consistent with good police work.'" Zelker, 455 F.2d at 716 (quoting United States v. Sanchez, 422 F.2d 1198, 1200 (2d Cir. 1970)). But even where the identification is not "on-the-scene," federal courts have been deferential in assessing whether exigent circumstances necessitate a showup. See, e.g., Dixon v. Miller, No. 03-cv-1611, 2005 WL 3240482, at *8 (E.D.N.Y. Nov. 30, 2005) (state court's admissibility finding where showup had occurred one to two hours after the criminal incident when a witness was brought to the scene of petitioner's apprehension was not "unreasonable in light of precedent"); McBride v. Senkowski, No. 98-cv-8663, 2002 WL 523275, at *5 (S.D.N.Y. Apr. 8, 2002) (sustaining showup where the victim was brought to a location two blocks from the crime scene to identify

---

[2] To the extent that showups are inherently suggestive, this rationale for their use, often advanced in the caselaw, is questionable. An innocent person may very well prefer the extended detention necessary to facilitate a lineup if it means avoiding an identification procedure that may increase the chances of misidentification, a wrongful charge, or even worse, a wrongful conviction. See Vasquez v. Poole, 331 F. Supp. 2d 145, 158-59 (E.D.N.Y. 2004).

suspects approximately two hours after the offense). Of course, given that relief is only warranted where the showup was unnecessarily suggestive, unreliable, and non-harmless, it is understandable why habeas courts may sometimes skip the issue of whether a showup was necessary given that relief is clearly unwarranted on some other ground.

On the other hand, Judge Spatt recently granted habeas relief on a showup claim and, in so doing, took a more exacting approach in evaluating whether a showup that occurred about an hour after the crime was necessary. In Brisco v. Phillips, Judge Spatt found that, given the amount of time that had elapsed after the crime, the investigation was not continuous and the true culprit may "have long fled the area." 376 F. Supp. 2d at 314. In concluding the showup was unnecessary, he also considered that, at the time of the identification, the petitioner was the only suspect and was cooperative. Id. at 315. After deciding the showup procedures employed were especially suggestive, Judge Spatt added that "[c]onsidering there was no need to conduct the showup . . . the mere fact that the showup was conducted in close temporal and geographic proximity does not cure the suggestiveness of the police action." Id. at 320. The court went on to determine that "the state courts erred by placing too great of a reliance on the fact that the showup was held in close geographic and temporal proximity, without analyzing the other circumstances present."[3] Id.

---

[3] Dissenting from the New York State Court of Appeals' earlier affirmance, Judge George Bundy Smith had noted that "[l]ooking solely at the time span [between the crime and identification], 55 minutes exceeds by 40 minutes the longest temporal span we have permitted." People v. Brisco, 99 N.Y.2d 596, 601, 758 N.Y.S.2d 262, 788 N.E.2d 611 (2003) (Bundy Smith, J., dissenting). The dissent added that "[c]ourts should do more than pay lip service to the acknowledgment that '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other factor-perhaps it is responsible for more such errors than all other factors combined.'" Id. at 602 (quoting Wall, Eye-Witness Identification in Criminal Cases, at 26, quoted in United States v. Wade, 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)).

This Court has similar concerns. As in Brisco, there was a significant break in time. Police brought the victim from the crime scene to the police station and then back to a third location more than 90 minutes after the crime for the sole apparent purpose of viewing the suspect – the prime suspect whom several witnesses had already implicated. The record strongly suggests that Francischelli was actually already under arrest at the time of the showup due to the allegations of Leslie Rodriguez and the Hall sisters. In fact, prior to the showup, the police had secured corroborating physical evidence of Francischelli's guilt.[4] Petitioner, moreover, was not arrested during a pursuit or canvass of the area, but pursuant to information specifically singling him out as the perpetrator. The only other potential suspect, Thomas Devenuto, was in custody as well and, thus, police might have included him in a lineup. On this record, the necessity for a showup is not evident. To the contrary, the lack of necessity is manifest.

Most troublesome, the state hearing court did not look far beyond the "geographic and temporal proximity" of the identification in determining that it was admissible. At the hearing, only the arresting detective testified. Neither the victim nor the police officers who drove him to the scene testified. Testimony regarding the identification procedure itself was scant. Essentially, Detective Drew testified that Francischelli stood next to two white police officers who were not in uniform. There was no inquiry into the age, build, or appearance of these officers, nor was there inquiry into the position and demeanor of these officers as they stood next to petitioner. Despite the lack of inquiry at the hearing, the court's written decision nevertheless

---

[4]  While the strong evidence of petitioner's guilt may strengthen his claim that a showup was unnecessary, it ultimately defeats his claim that he was prejudiced by the showup. See Jamison v. Grier, No. 01-cv-6678, 2002 WL 100642, at *21 (S.D.N.Y. Jan. 25, 2002).

states that petitioner was "standing among individuals who looked and dressed alike."

Franceschelli, No. 679/00, slip op. at 4. But, even assuming that the showup was unnecessarily suggestive, reliability must still be assessed, and since the issue is more easily resolved on this ground, the Court now moves on in its review. Cf. Van Pelt v. Keane, No. 90-cv-2072, 1991 WL 81973, at *6 (E.D.N.Y. May 6, 1991) (finding that showup occurring approximately 30 minutes after the crime and near crime scene was unnecessarily suggestive but nonetheless reliable).

### Independent Reliability[5]

The carjacking victim, Chowdhury, testified at trial that he was able to directly view Franceschelli's face. His testimony, to be fair, does not conclusively establish the degree of attention that he directed toward petitioner. But, the record is certainly clear that Chowdhury did look at petitioner several times. Of note, this was a one-on-one encounter where the two communicated, at least initially, face-to-face. Cf. Brathwaite, 432 U.S. at 115 (noting that the witness "was not a casual or passing observer, as is so often the case with eyewitness identification"). Franceschelli was not one in a large crowd, nor can it be said that events were particularly fast-moving or stress-inducing before the point at which petitioner pointed the fake gun at Chowdhury's head. Taken in totality, there can be little doubt that the victim had adequate opportunities before and during the commission of the crime to form a mental picture of the perpetrator.

Although Chowdhury's identification of petitioner may have taken place in a suggestive

---

[5] Much of the evidence regarding independent reliability was neither heard nor assessed by the hearing court because the victim never testified at the pretrial hearing. Since the state courts never reached the issue of independent reliability in their analyses, this court reviews the issue de novo. See Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003); see also Dunnigan, 137 F.3d at 129 (determining independent reliability based on the state court record and without remanding for a hearing).

atmosphere, the level and nature of his interaction with Francischelli before and during the crime compel a finding that the identification was nonetheless reliable. As a first matter, the testimony shows that Chowdhury quickly and immediately identified petitioner at the Hall apartment. He never expressed doubts. Secondly, the identification took place about 98 minutes after the robbery, so that the preceding events may still have been fresh in the victim's mind. Cf. Brathwaite, 432 U.S. at 108 ("*Only* two days elapsed between the crime and the photographic identification.") (emphasis added). The lone factor that weighs against a finding of independent reliability is the police report, taken immediately after the incident, that Chowdhury had described the perpetrator as five-foot-nine-inches tall, 170 pounds, and with black hair. Petitioner is six-feet tall and 150 pounds with blond hair. However, at trial, Chowdhury insisted that he had never described petitioner as having black hair. His claim was bolstered when Detective Drew testified that the police radio transmission directly after the incident indicated that the suspect had blond hair. (The prosecution suggested that any error in transcription may have been due to Chowdhury's accent.) At all times, Chowdhury has maintained that the perpetrator was "slim," and given that Chowdhury observed petitioner from the seated viewpoint of his taxicab, his misstatement of petitioner's height is not so great as to raise serious doubts regarding the reliability of the identification. Cf. Dunnigan v. Keane, 137 F.3d 117, 130 (2d Cir. 1998) (finding 2 inch and 30 pound discrepancies in victim's description of height and weight to be outweighed by other factors).

In sum, the evidence of independent reliability is strong enough to minimize any risk of misidentification that may be attributed to the pre-identification police procedures. The identification evidence was certainly not of "such inherent unreliability that it [was] inappropriate

15

for a jury to determine the weight to give the evidence." Vasquez v. Poole, 331 F. Supp. 2d 145, 150 (E.D.N.Y. 2004) (citing Biggers, 409 U.S. at 198). This Court concludes, then, that the evidence of Chowdhury's identification of Francischelli, though resulting from an unnecessary showup and possibly obtained through an unnecessarily suggestive procedure, was sufficiently reliable to negate any due process concerns. In any event, given the overwhelming weight of evidence against petitioner at trial, see infra, any constitutional error was clearly harmless by any standard.[6] As such, the writ cannot issue on this ground.

## II.    *Insufficiency of Trial Evidence Claim*

Petitioner next contends that the evidence presented at trial was insufficient to support his convictions beyond a reasonable doubt. In assessing such a claim, a habeas court must view all evidence in a "light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (citing

---

[6] In Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court held that, on collateral review, for constitutional error to be non-harmless, a petitioner must demonstrate that the error "had substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." Id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The Supreme Court had previously held in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that state courts are, in the first instance, to overturn criminal convictions infected by constitutional error unless the error is "harmless beyond a reasonable doubt." Id. at 24. Following the passage of AEDPA, which afforded an additional degree of deference to all state court determinations of federal law, the Second Circuit held that, where a state court has explicitly undertaken its own harmless error analysis under the standard set forth in Chapman, a habeas court should review that determination under the deferential AEDPA standard rather than apply the already-deferential Brecht standard. Gutierrez v. McGinnis, 389 F.3d 300, 306 (2d Cir. 2004). Thus, in the Second Circuit, Brecht is no longer applicable when the state court has explicitly undertaken its own harmless error analysis under Chapman. It remains unclear, however, what standard a habeas court should apply where, as here, the state court never reached harmless error in its analysis. The Second Circuit has not decided the issue. Lyons v. Conway, No. 9:03-cv-503, 2006 WL 2847281, at *10 (N.D.N.Y. Sep. 30, 2006) (citing Howard v. Walker, 406 F.3d 114, 123 (2d Cir. 2005)). The Supreme Court recently granted a writ of certiorari on a petition raising the question. See Fry v. Pliler, No. 04-16876, 2006 WL 249542 (9th Cir. Feb. 2, 2006), cert. granted, 75 U.S.L.W. 3308 (U.S. Dec. 7, 2006) (No. 06-5247).

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Given that the reviewing court may not substitute its judgment for that of a rational jury, the burden of a convicted individual in challenging the sufficiency of evidence upon which he was convicted has often been described as a heavy one. See, e.g., United States v. Santos, 449 F.3d 93, 102 (2d Cir. 2005); United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002).

Petitioner fails to carry his heavy burden as he has failed to show that state court determinations regarding the sufficiency of evidence were contrary to, or an unreasonable application of, any Supreme Court precedent, and specifically, the standard for insufficiency of evidence put forth in Jackson v. Virginia. Bluntly, he comes nowhere close. The evidence against him was not merely sufficient to support his convictions, it was overwhelming. Francischelli was identified by the victim both on the night of the crime and at trial. He was found, just 90 minutes after the crime, at an apartment containing personal items stolen from the victim. Petitioner was the only man present at the apartment where he was arrested. Neither of the two other men who were previously around the apartment, Leslie Rodriguez or Thomas Devenuto, matched the victim's description of the perpetrator. Both Pamela and Penelope Hall had implicated petitioner. At trial, Penelope, petitioner's former girlfriend, testified about how petitioner had left her apartment on the night of the armed robbery with a fake pistol, saying that he was going to rob someone. She further recounted how petitioner had returned to the apartment and bragged about robbing a cabdriver. Given that police responded so quickly to the Hall apartment, it is clear that the universe of potential suspects was exceedingly small. At trial, defense counsel took his best shot by trying to pin the crime on Thomas Devenuto, who was also present around the Hall apartment immediately after the crime. However, the defense strategy

17

faced one insurmountable obstacle: Devenuto had a beard and moustache on the night of the offense and the victim had maintained from the beginning that the perpetrator had no facial hair. Unfortunately for petitioner, given the overwhelming weight of evidence against him, counsel likely determined (understandably) that despite Devenuto's facial hair, there was no better defense to pursue. Petitioner's claim regarding the sufficiency of trial evidence is rejected.

III.    *Apprendi Claim*

Petitioner claims that his Sixth and Fourteenth Amendment rights were violated when the trial court adjudicated him a persistent violent felon without submitting his prior convictions to a jury to be proven beyond a reasonable doubt. Petitioner cites to Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Apprendi, the Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490 (emphasis added); see also Cunningham v. California, 549 U.S. ___, 2007 WL 135687 (Jan. 22, 2007); Shepard v. United States, 544 U.S. 13, 38, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (O'Connor, J., dissenting) ("[W]hatever the merits of the Apprendi doctrine, that doctrine does not currently bear on . . . determinations of a defendant's past crimes."); People v. Rivera, 5 N.Y.3d 61, 67, 800 N.Y.S.2d 51, 833 N.E.2d 194 (2005) (noting Supreme Court's "obvious prerogative" to overrule its exception for prior convictions).

New York's persistent violent felony offender statute, N.Y. Penal Law § 70.08, requires the trial judge to adjudicate the convicted felon as a persistent violent felony offender if that felon has previously been convicted of two or more predicate felony offenses. New York's

"discretionary" persistent felony offender statute, N.Y. Penal Law § 70.10, has withstood multiple constitutional challenges in the Second Circuit based on Apprendi and Ring. See, e.g., Brown v. Miller, 451 F.3d 54 (2d Cir. 2006); Brown v. Greiner, 409 F.3d 523 (2d Cir. 2005). In those cases, the Second Circuit concluded that, given the Supreme Court's language in Apprendi expressly excepting prior convictions from those facts that must be proven to a jury to enhance a sentence, § 70.10 does not contravene its rule of decision by requiring that a trial court determine the fact of petitioner's prior conviction. See Brown v. Greiner, 409 F.3d at 534. Accordingly, district courts in this circuit have routinely rejected similar challenges to § 70.08 based on Apprendi. See, e.g., Cruz v. Filion, 456 F. Supp. 2d 474, 482-83 (S.D.N.Y. 2006); Wheeler v. Phillips, No. 05-cv-4399, 2006 WL 2357973, at *12 (E.D.N.Y. Aug. 15, 2006); James v. Artus, No. 03-cv-7612, 2005 WL 859245, at *16 (S.D.N.Y. Apr. 15, 2005); McKenzie v. Poole, No. 03-cv-4253, 2004 WL 2671630, at *10 (E.D.N.Y. Nov. 23, 2004). The Second Department's affirmance of petitioner's conviction and enhanced sentence as a persistent violent felony offender is, therefore, consistent with Apprendi. Francischelli's objection on this ground thus fails.

IV.    *Excessive Sentence Claim*

Petitioner's claim regarding the harsh and excessive nature of his sentence was heard and rejected by the Second Department. To the extent that petitioner raises an Eighth Amendment claim, the Court notes that a state court's sentence that falls within the state statute's authorized range is not ordinarily susceptible to an Eighth Amendment challenge. Brown v. Perlman, No. 03-cv-2670, 2006 WL 2819654, at *7 (S.D.N.Y. Sep. 29, 2006); Davis v. Johnson, 258 F. Supp. 2d 93, 104 (E.D.N.Y. 2003) (citing Dorsey v. Irvin, 56 F.3d 425, 427 (2d Cir.1995); White v.

Keane, 969 F.2d 1381, 1383 (2d Cir.1992) (per curiam)). A habeas petitioner may attempt to challenge his sentence on the ground that it is grossly disproportionate to the offense charged, but that standard is satisfied only in the "exceedingly rare" and "extreme" noncapital case. Lockyer v. Andrade, 538 U.S. 63, 73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). Here, petitioner's criminal history is extensive. Before the convictions stemming from this incident, he had already been convicted of 12 felony offenses, nine of which are classified as violent felonies under New York law. His disproportionality claim is no more compelling than that of the persistent felon whose challenge to California's three-strikes law was rejected by the Supreme Court in Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003). In Ewing, the persistent felon, who had an extensive criminal history, was sentenced to 25-years-to-life after a non-violent robbery in which he stole three $399 golf clubs. Id. at 18.

Given the nature of Eighth Amendment disproportionality jurisprudence, a state prisoner's sentence must be truly shocking for a federal court to intervene. This is not such a case. Accordingly, the Second Department's decision affirming petitioner's conviction was not contrary to or an unreasonable application of any federal law. Francischelli's claim, on this point too, is rejected.

V.    *Crawford Claim*

Petitioner's conviction became final, for AEDPA purposes, when his time to seek a writ of certiorari from the United States Supreme Court expired on August 21, 2003. Shortly thereafter, on March 8, 2004, the United States Supreme Court issued its decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which "redefine[d] the scope

and effect" of the Sixth Amendment's Confrontation Clause. United States v. Saget, 377 F.3d 223, 226 (2d Cir. 2004). Crawford abrogated the Supreme Court's earlier decision in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), "with respect to prior testimonial statements by holding that such statements may never be introduced against the defendant unless he or she had an opportunity to cross-examine the declarant." Saget, 377 F.3d at 226.

Petitioner sought the retroactive benefit of Crawford by filing a CPL 440 motion in New York State Supreme Court, Queens County, on January 6, 2005. On March 25, 2005, the state court held that Crawford does not apply retroactively. Leave to appeal this decision was denied by the Second Department on September 15, 2005. By amended petition, dated September 25, 2006, petitioner attempts to add his Crawford claim to the those before this Court, claiming that he was "denied fundamental rights as 'testimonial' evidence was introduced without the benefit of affording Petitioner the right to cross-examination." Petitioner does not specify what "testimonial" statements allegedly run afoul of Crawford, though he does assert that the statements were made at a suppression hearing.

Given that this claim is unquestionably invalid on its face, the Court finds no reason to again order the respondent to show cause. As an initial matter, the Court can find no authority applying Crawford to a suppression hearing. Cf. Washburn v. United States, No. 3:05-cv-774, 2006 WL 3715393, at *4 (N.D. Ind. Dec. 14, 2006) ("[C]ases decided after Crawford v. Washington reaffirm the admissibility of hearsay statements at suppression hearings."); United States v. Thompson, No. 4:05-cr-161, 2005 WL 3050634, at *5-6 (E.D. Mo. Nov. 14, 2005); People v. Brink, 31 A.D.3d 1139, 818 N.Y.S.2d 374 (4th Dep't 2006). Yet, the Court need not reach this issue given that the state trial court correctly held that the Crawford decision does not

21

apply retroactively on collateral review to defendants whose convictions became final before Crawford was decided. <u>Whorton v. Bockting</u>, 549 U.S. ___, 2007 WL 597530 (Feb. 28, 2007).

## CONCLUSION

For the reasons set forth above, the petition of James Franischelli for a writ of habeas corpus is dismissed. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue with respect to any of petitioner's claims. 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated: Brooklyn, New York
   March 9, 2007

ERIC N. VITALIANO
United States District Judge